UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


CRAIG SHELTON,

          Plaintiff,

   v.

FISKAR BRANDS, INC., d/b/a GERBER
LEGENDARY BLADES,

       Defendant.

Case No. 3:12-cv-1836-ST

FINDINGS AND
RECOMMENDATIONS


STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Craig Shelton ("Shelton"), filed this action against his former employer, defendant Fiskar Brands, Inc., dba Gerber Legendary Blades ("Gerber"), alleging that he was unlawfully terminated based on his participation in military service. The Amended Complaint (docket #20) alleges three claims against Gerber for retaliating against him for requesting and taking military leave in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 USC §§ 4301–4433 ("USERRA"), ORS 659A.082, and the common law doctrine of wrongful discharge.

1 – FINDINGS AND RECOMMENDATIONS

This court has federal question jurisdiction over the USERRA claim pursuant to 28 USC § 1331 and supplemental jurisdiction over the state law claims under 28 USC 1367(a).

Shelton has filed a Motion for Partial Summary Judgment (docket #43) against six of Gerber's affirmative defenses, and Gerber has filed a Motion for Summary Judgment (docket #46) against Shelton's three claims.  For the reasons set forth below, Shelton's motion should be granted, and Gerber's motion should be granted against the wrongful discharge claim but denied as to the other two claims.

### UNDISPUTED FACTS

On July 6, 2011, Gerber hired Shelton, a member of the United States Army Reserve, as a Regional Sales Manager.  Bateman Depo.,[1] pp. 118–19; Shelton Depo., pp. 20, 103.  Shelton's direct supervisor was Brent Bateman ("Bateman"), the Vice President of Sales and a former member of the Oregon Army Guard.  Bateman Depo., pp. 52, 61.  Shelton's military service was a positive factor in Gerber's decision to hire him.  Landmark Depo., p. 24.

On January 30, 2012, after six months on the job, Bateman met with Shelton as part of the year-end review process to discuss Shelton's performance.  Shelton Depo., pp. 119–20; Bateman Depo., Ex. 91, p. 1.  At that meeting, Bateman discussed shortcomings in Shelton's performance and was surprised at Shelton's more positive self-evaluation.  Bateman Depo., pp. 96–98.  At some point after the meeting, Bateman amended Shelton's review to lower his overall performance score.  *Id*, p. 97, Ex. 13, pp. 3, 5, & Ex. 15, pp. 3, 5.

Shelton was scheduled to go on a business trip soon after his performance review, and due to concern over his level of performance, Bateman requested a copy of Shelton's sales presentation to review.  *Id*, pp. 149–50 & Ex. 91, p. 1.  Upon review, Bateman pointed out

---

[1] The parties have submitted portions of the deposition transcripts and exhibits introduced at those depositions.  All references are to the deposition exhibit numbers or page numbers of the deposition transcripts.

problems to Shelton who promised to correct the errors. *Id*, Ex. 91, p. 2. At the end of the day on February 7, 2012, after Shelton returned from his business trip, Bateman asked Shelton to show him, as if he were a customer, the PowerPoint presentation he had given to clients on his sales trip. *Id*, pp. 154–55, 158, 160; Shelton Depo., p. 219. Bateman felt that Shelton had not corrected errors in the presentation that Bateman had suggested before the sales trip and began to write an email listing questions that Shelton had not adequately answered about the product line. Bateman Depo., pp. 21, 165-66, Ex. 47, & Ex. 91, pp. 3-4. He stopped writing the email when he "realized that [he] was putting more effort to the job than Mr. Shelton was and, at that point in time, determined he wasn't capable of doing the job." *Id*, p. 21. [2]

On his way home that same day, Shelton received a voicemail from his commanding officer, Command Sergeant Major Smith, notifying Shelton of mandatory military duty February 9-14, 2012. Shelton Depo., pp. 225–26. Shelton did not talk to anyone at Gerber that evening, but notified Bateman at 8:00 a.m. the next morning on February 8, 2012, of his upcoming military duty. *Id*, pp. 26-27. Bateman was upset at the news and called Command Sergeant Major Smith. Bateman Depo., pp. 32–34, 171, & Ex. 62, p. 1. Command Sergeant Major Smith told Bateman that the military duty was mandatory. Smith Depo., pp. 62–64. After consulting with Human Resources, Bateman was allowed to fulfill his military obligation, but on February 17, 2012, two days after returning to work, was terminated. Bateman Depo., 189 & Ex. 91, p. 5; Shelton Depo., p. 282.

---

[2]  Gerber has submitted evidence that the same day immediately after the meeting with Shelton, Bateman spoke briefly to Gerber's President, Jason Landmark, ("Landmark"), about terminating Shelton. *Id*, pp. 167-68; Landmark Depo., pp. 31–34, 44. Landmark approved the termination and instructed Bateman to discuss the matter with the Vice President of Human Resources, Kristen Alvarez ("Alvarez"). Landmark Depo., p. 34. Immediately afterwards, Bateman spoke to Alvarez who suggested terminating Shelton on February 10, 2012. Bateman Depo., p. 168; Alvarez Depo., pp. 62–65. However, as discussed below, Shelton disputes the veracity of this evidence.

Shelton filed a charge with the Department of Labor, Veterans' Employment and Training Service (VETS).  Alvarez Depo., p. 23 & Ex. 64.  Upon completion of its investigation, VETS determined there was probable cause that "Shelton's allegations are meritorious . . . [and] that [Gerber] is not in compliance with:  [USERRA]."  Amended Complaint, Ex. C, p. 2.

## STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  FRCP 56(a).  The initial burden is on the moving party to point out the absence of any genuine issue of material fact.  Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried.  *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986).  On a motion for summary judgment, the court "draws all justifiable inferences in favor of the non-moving party."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F3d 1119, 1125 (9th Cir 2014), citing *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986).  In employment discrimination cases, "very little evidence" is required to survive summary judgment "because the ultimate question is one that can only be resolved through a searching inquiry – one that is most appropriately conducted by the factfinder, upon a full record. "  *Schnidrig v. Columbia Mach., Inc.*, 80 F3d 1406, 1410 (9th Cir) (internal quotations, citation omitted), *cert. denied*, 519 US 927 (1996).

///

///

///

///

///

## FINDINGS

I.    **Uniformed Service Discrimination (First & Second Causes of Action)**

    A.    **Legal Standards**

USERRA prohibits employment discrimination against military personnel based on their

service:

> An employer may not discriminate in employment against or take any
> adverse employment action against any person because such person
> (1) has taken an action to enforce a protection afforded any person under
> this chapter, (2) has testified or otherwise made a statement in or in
> connection with any proceeding under this chapter, (3) has assisted or
> otherwise participated in an investigation under this chapter, or (4) has
> exercised a right provided for in this chapter.  The prohibition in this
> subsection shall apply with respect to a person regardless of whether that
> person has performed service in the uniformed services.

38 USC § 4311(b).

"Although the term 'retaliation' is not used in USERRA, the gravamen of this section is

to prohibit adverse employment actions taken in retaliation for the exercise of the rights provided

by USERRA."  *Wallace v. City of San Diego*, 479 F3d 616, 625 n1 (9th Cir 2007).

Under ORS 659A.082(2)(c), it is an unlawful for an employer "to discriminate against a

person because of the person's service in a uniformed service" by "[d]ischarging, expelling,

disciplining, threatening or otherwise retaliating against the person for exercising or attempting

to exercise the status or rights provided by this section."  This law "shall be construed to the

extent possible in a manner that is consistent with similar provisions of the federal [USERRA]."

ORS 659A.082(4).

"Person" is defined by USERRA as someone who is "a member of, applies to be a

member of, performs, has performed, applies to perform, or has an obligation to perform service

in a uniformed service."  38 USC § 4311(a).  An employer violates the statute if the employee's

"exercise of a right provided for in this chapter, is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such person's . . . exercise of a right." 38 USC § 4311(c)(2). The employee has the initial burden of showing "that his or her protected status was 'a substantial or motivating factor in the adverse [employment] action.'" *Leisek v. Brightwood Corp.*, 278 F3d 895, 899 (9th Cir 2002), quoting *Sheehan v. Dep't of Navy*, 240 F3d 1009, 1013 (Fed Cir 2001) (alteration in original). A "motivating factor" need not be the sole cause of the employment action. *Id* at 898. The factual question of discriminatory motivation or intent may be proven by either direct or circumstantial evidence. *Sheehan*, 240 F3d at 1014. "[T]he employer may then avoid liability only by showing, as an affirmative defense, that the employer would have taken the same action without regard to the employee's protected status." *Leisek*, 278 F3d at 899, citing *Sheehan*, 240 F3d at 1013 (additional citation omitted).

### B.    Analysis

Gerber seeks summary judgment against the First and Second Causes of Action on the basis that Shelton lacks direct or circumstantial evidence to meet his initial burden at the "motivating factor" step of the analysis and lacks evidence to prove causation. As discussed below, this court finds that Shelton has presented sufficient evidence to avoid summary judgment on these claims.

### 1.    Direct Evidence

"When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Godwin v. Hunt Wesson, Inc.*, 150 F3d 1217, 1222 (9th Cir 1998). In employment discrimination cases, "[d]irect evidence typically consists of clearly sexist, racist, or similarly discriminatory

statements or actions by the employer." *Coghlan v. Am. Seafoods Co. LLC.*, 413 F3d 1090, 1095 (9th Cir 2005). For example, in *Bobo v. United States Parcel Serv., Inc.*, 665 F3d 741, 754–55 (6th Cir 2012), the court held a jury could find a direct supervisor's comment, "I did not want [plaintiff] volunteering for additional military duty when he was needed at UPS," was a discriminatory remark that constituted direct evidence sufficient to support a USERRA claim.

Shelton argues that Bateman made several, equally discriminatory remarks as in *Bobo* regarding his military service. First, Shelton cites Bateman's response to receiving notice in July 2011 that Shelton had an upcoming two-week military duty. Shelton recalls Bateman saying, "We're too busy this time of year. I don't want you to go on it." Shelton Depo., p. 128. Shelton then found someone to replace him on military duty. *Id*, pp. 128-29. Bateman has a different recollection of his response, stating that "the timing was odd, but [that he] certainly expected he would have duty, and specifically asked that he check with human resources on our leave policy related to vacation time or how he would be compensated." Bateman Depo., p. 137. When Shelton responded that he could continue to work during his military leave, Shelton replied, "If you have military duty, you have military duty. Do the military duty," but was not "in favor of [Shelton] doing both." *Id*, pp. 137–38. However, for the purpose of summary judgment, this court must view the facts in favor of Shelton.

Shelton also cites several actions by Bateman after learning of his February 2012 military leave. When Shelton gave his notice by email, Bateman responded with a request asked for contact information for Shelton's unit and chain of command, explaining: "Certainly [your chain of command] understand that this is a burden to both you and to Gerber as your employer. . . . maybe I can help your cause by helping them understand the burden on Gerber." Bateman Depo., Ex. 62, p. 2. In an email to Vice President of Human Resources, Kristen Alvarez

("Alvarez"), later that day, Bateman wrote: "To have Craig now gone until next Wednesday is not only unexpected but the timing is horrible. I am planning on calling the contact he listed . . . and simply request that he be dismissed from duty." *Id*, Ex. 62, p. 1. When Shelton gave Bateman a copy of the order requiring him report to duty, Bateman "snatched them out of [Shelton's] hand and said, Don't take them down to HR. I will do it." Shelton Depo., p. 231. Later that day, Bateman called Command Sergeant Major Smith to inquire about Shelton's order. Smith Depo., p. 63; Bateman Depo., p. 33. Smith recalls that Bateman was "very agitated over [Shelton's] having orders for that period. He was trying to get him out of the orders in any way he could." Smith Depo., p. 63 & Ex. 203. In contrast, Bateman recalls stating only that "it was going to be a challenge on short notice to have [Shelton] gone." Bateman Depo., p. 34. Again, however, the facts must be viewed in Shelton's favor on summary judgment.

Bateman's 2011 statements to Shelton, 2012 email to Alvarez, and 2012 conversation with Command Sergeant Major Smith all express his opposition to Shelton fulfilling his military obligations and, similar to the supervisor's statement in *Bobo*, could be found by a jury to constitute direct evidence of his discriminatory animus. In fact, Bateman is even more closely related to the termination decision than the supervisor in *Bobo*. While the supervisor in *Bobo* was not involved in the decision to terminate Bobo, *Bobo*, 665 F3d 741 at 747, Bateman recommended Shelton's termination to Landmark and Alvarez.

## 2.    Circumstantial Evidence

Even if this evidence is not deemed to constitute direct evidence of Bateman's discriminatory animus, Shelton has produced sufficient circumstantial evidence that his military leave was a motivating factor in his termination to avoid summary judgment.

> Under USERRA, discriminatory motivation of the employer may be
> reasonably inferred from a variety of factors, including proximity in time

> between the employee's military activity and the adverse employment
> action, inconsistencies between proffered reason and other actions of the
> employer, an employer's expressed hostility towards members protected
> by the statute together with knowledge of the employee's military activity,
> and disparate treatment of certain employees compared to other employees
> with similar work records or offenses.

*Leisek*, 278 F3d at 900 (internal quotation marks and citation omitted).

Bateman explains that his alleged hostility was not due to any discriminatory animus, but instead stemmed from his belief that Shelton was using military duty as a way to avoid his work obligations. Bateman was angry upon hearing of Shelton's military duty based on Shelton's poor presentation on February 7, 2012 "in which [he] displayed an inability, an incompetency, to do the job, and thought he might be working the system." Bateman Depo., pp. 32–33, 171. He believed that Shelton "could pick and choose when — when he drilled, when he put in his time with the military" and that he "was using his military duty to avoid hot water." *Id*, pp. 14, 32, 173. Bateman made similar statements to the VETS investigator: "I found the timing of his notification to be suspect. Especially since [Shelton] was well aware after making a presentation to me . . . that he had failed over the last 7 months of employment with Gerber to learn very basic facts about our product, customers, and communication expectations." *Id*, Ex. 91, p. 4.

Bateman's explanation that he was angry only because he believed Shelton was choosing to participate in non-mandatory military duty "to avoid hot water" at work does not avoid liability. Even if the jury believes Bateman, it could infer a discriminatory motive because USERRA protects both voluntary and involuntary military service. *See* 38 USC § 4303(13) (defining "service in the uniformed services" as "performance of duty on a voluntary or involuntary basis in a uniformed service"); *see also Maxfield v. Cintas Corp. No. 2*, 427 F3d 544, 552 (8th Cir 2005) (inferring discriminatory animus from employer's call to plaintiff's command officer inquiring whether plaintiff's presence was "imperative"). For this reason, evidence of

Bateman's hostility towards Shelton's military leave constitutes circumstantial evidence sufficient to support the first two claims.

Additional circumstantial evidence of discriminatory animus is Gerber's termination of Bateman immediately upon his return from military leave. On February 8, 2012, Shelton notified Gerber that he would be gone for military duty February 9-14, 2012, and was terminated on February 17, 2012, only two days after he returned to work. In USERRA cases, courts have consistently found that proximity in time between the employer's notice of the employee's military leave and termination is circumstantial evidence of discrimination. *See, e.g.*, *Maxfield*, 427 F3d at 552 (evidence that plaintiff's employer demoted him the day he returned from military service).

Gerber cites cases finding that proximity alone is insufficient evidence to carry a plaintiff's burden to show causation. *See, e.g.*, *Ventura v. Johnson Controls, Inc.*, Nos. CV 08-1318-PK(LEAD), CV 09-190-PK, 2010 WL 3767882, *10 (D Or Sept. 16, 2010); *Arnoth v. DHL Exp. (U.S.A.), Inc.*, No. CV 09-241-HU, 2010 WL 724129, at *8 (D Or Mar. 2, 2010). However, these cases involve discrimination claims under Title VII and Oregon law, not USERRA. Moreover, the Ninth Circuit has stated that "[t]emporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in *some* cases." *Stegall v. Citadel Broad. Co.*, 350 F3d 1061, 1069 (9th Cir 2003). In that case, the nine day lapse between the plaintiff's complaints of discrimination and her termination was "highly probative." *Id.* Thus, even under non-USERRA law, a gap of several days between Shelton's protected activity and termination supplies circumstantial evidence of discriminatory intent.

///

### 3.    **Causation**

Regardless of any direct or circumstantial evidence, Gerber argues that it is entitled to summary judgment based on the lack of evidence that Gerber knew of Shelton's military leave before making the decision to terminate him on February 7, 2012.  To establish actionable retaliation, the employer must have knowledge of the plaintiff's protected activity.  *Cohen v. Fred Meyer, Inc.*, 686 F2d 793, 796 (9th Cir 1982) (citations omitted) (Title VII case) ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.").

Gerber was aware of Shelton's status as a member of the United States Army Reserve before firing him.  In fact, his military affiliation boosted his application for the Gerber job. Shelton had taken military leave prior to February 2012, and Bateman approved his request for his February 2012 leave.  But Shelton does not allege discrimination based on his military status in general or his past requests for military leave.  He alleges retaliation based only on his February 8, 2012 leave request.  In that regard, Gerber argues that the evidence is undisputed that the decision to terminate Shelton based was final on February 7, 2012, before Shelton notified Bateman of his military obligation the next day.

Bateman testified that after Shelton gave his mock presentation on February 7, 2012, he "realized [he] was investing more in his job than Mr. Shelton was, and it was better to terminate him."  Bateman Depo., p. 166.  That same day, Bateman told his supervisor, Gerber's President, Jason Landmark, ("Landmark"), that he had "just had a meeting with [Shelton]," who had "failed miserably in his presentation," that "[S]helton wasn't capable of doing his job . . . and that [he] wanted to terminate him."  *Id*, p. 167.  According to Bateman, Landmark responded "If he's not capable, then get rid of him," and directed him to talk to Alvarez.  *Id*, p. 168.

Although he could not recall the date of the conversation, Landmark confirmed that Bateman voiced a "tremendous amount of frustration to [him] regarding [Shelton's] performance" and recommended termination based on "pretty serious performance-related issues." Landmark Depo., pp. 31–32. Landmark approved the termination and instructed Bateman to discuss the matter with Alvarez. *Id,* pp. 34, 44.

According to Alvarez, Bateman came to her office late in the work day on February 7, 2012, after the meeting with Shelton, and said "in spite of . . . best efforts, he felt that it was time to terminate [Shelton]." Alvarez Depo., pp. 63, 65. Alvarez asked if Bateman was "positive about this decision, it there was anything else that he felt that he needed to — to do, as far as giving [Shelton] feedback or giving him an opportunity to—to improve if there were performance issues," but Bateman told her "there wasn't an opportunity to move forward because he felt that he was . . . putting in more effort than [Shelton] was." *Id*, p. 63. Alvarez responded that they "should go ahead and proceed with the termination" on Friday, February 10, in accordance with the "fairly normal practice" to terminate employees on Fridays, and requested that Bateman determine the status of Shelton's projects to avoid a lapse in service prior to his termination. *Id*, pp. 64–65. However, upon learning the next day of Shelton's request for leave, Alvarez was concerned because they "had decided to terminate him the evening before, and now we received a verbal indication that there were leave orders." *Id*, p. 67. She "was concerned about [Gerber's] obligation under the law and didn't want to have the perception that [Gerber was], you know, terminating somebody who was on leave." *Id*.

If believed by a jury, this testimony by Bateman, Landmark and Alvarez is sufficient to defeat Shelton's uniformed service discrimination claims based on lack of causation. However,

Shelton points out inconsistencies in the evidence to cast doubt on the credibility of these witnesses as to whether the termination decision was final on February 7, 2012.

Written documentation indicates that Gerber did not begin the termination process until February 15, 2012. Bateman Depo., p. 82 & Ex. 17. In addition, Bateman's behavior after learning of Shelton's military duty, but prior to his termination, arguably contradicts his testimony that the termination decision was final on February 7 and based entirely on job performance.

First, Bateman's emails to Shelton and Alvarez the afternoon of February 8, after learning of Shelton's military duty, do not indicate an intent to terminate Shelton. In his email response to Shelton, Bateman offered to contact Shelton's commanding officer "so maybe [he] could help [Shelton's] cause by helping [the Army] understand the burden on Gerber." *Id*, Ex. 62, p. 2. When asked at his deposition about that "burden on Gerber," Bateman responded: "I'm not sure there would have been one. I was trying to put a hurdle in [Shelton's] way." *Id*, p. 172. Bateman again expressed the inconvenience of Shelton's absence in an email to Alvarez later that day: "[Shelton] and I are working very closely on his business planning, communications and executing the business. To have [Shelton] now gone until next Wednesday is not only unexpected but the timing is horrible." *Id*, Ex. 62, p. 1. Bateman also asked if Alvarez wanted to speak to Shelton's commanding officer "that to be notified one day in advance creates issues" and also to Shelton "based on our conversation that he communicated work days off would be minimal." *Id.* When asked at his deposition about why he had these communications with Alvarez if he had already decided to terminate Shelton, Bateman responded that he "didn't trust that [Shelton] had duty. I wanted human resources to have this information." *Id*. p. 15. If Bateman had already decided to terminate him, as it claims, then

Shelton argues that Gerber would suffer no hardship with Shelton absent for merely a few days and Bateman would have no reason to ask Human Resources to counsel him about giving short notice for future military obligations.

Shelton also points to Bateman's suggestion to Command Sergeant Major Smith that Shelton could not miss work for military leave because he was working on a "business plan." Smith Depo., p. 63. Bateman testified that he may have referred to "working on a business plan as the need to have — or the desire to have him there." *Id*, p. 185. However, if Bateman had already decided to terminate Shelton, as he claims, Shelton argues that he would not be working on any business plans.

Alvarez and Bateman also are inconsistent regarding their conversation in Alvarez's office on the evening of February 7, 2012. Bateman testified that they "were to resume the conversation the next day." *Id*, p. 168. However, Alvarez did not remember telling Bateman that they would continue the conversation the next day. Alvarez Depo., p. 62.

Shelton also relies on evidence that his performance review was finalized after his termination. Bateman prepared Shelton's written performance review to discuss with him on January 30, 2012, but later amended it to lower the overall performance score. Bateman Depo., p. 97, Ex. 13, pp. 3, 5 ,& Ex. 15, pp. 3, 5. Shelton testified that Bateman did not disclose his ratings during January 30, 2012 meeting (Shelton Depo., p. 196), and Bateman's testimony is inconsistent as to whether he told Shelton about lowering one rating at that meeting. Bateman Depo., pp. 97, 101. Bateman also does not remember when he made the amendment, but testified that it occurred prior to Shelton's termination. *Id*., p. 98. The "due date" on the amended performance review is January 31, 2012, but the date in the footer at the bottom of the report is February 23, 2012, after Shelton's termination. *Id*, Ex. 15, p. 1. This evidence would

permit a jury to find that Bateman did not amend and complete Shelton's performance review prior to his termination, but instead changed it afterwards.

Shelton has submitted sufficient evidence to create a genuine issue as to whether Gerber's decision to terminate him was made after receiving notice of his military leave. Therefore, Gerber's summary judgment motion as to the First and Second Causes of Action should be denied.

## II.    <u>**Wrongful Discharge (Third Cause of Action)**</u>

The Third Cause of Action alleges that Gerber wrongfully discharged Shelton under Oregon law.  A wrongful discharge claim is an "interstitial tort, designed to fill a remedial gap where a discharge in violation of public policy would otherwise not be adequately remedied." *Dunwoody v. Handskill Corp.*, 185 Or App 605, 613, 60 P3d 1135, 1139 (2003).  Wrongful discharge claims can be brought only when the discharge is:  (1) for exercising a job-related right that reflects an important public policy; or (2) in response to an employee fulfilling some important public duty.  *Lamson v. Crater Lake Motors, Inc.*, 216 Or App 366, 375, 173 P3d 1242, 1247 (2007), *aff'd*, 346 Or 628, 216 P3d 852 (2009).  However, the additional remedy of wrongful discharge will not be accorded where a statutory remedy is "adequate to protect both the interests of society . . . and the interests of employees," *Brown v. Transcon Lines*, 284 Or 597, 614, 588 P2d 1087, 1095 (1978) (*en banc*) (internal quotation marks and citation omitted), and is intended by the legislature "to abrogate or supersede any common law remedy for damages."  *Holien v. Sears, Roebuck and Co.*, 298 Or 76, 91, 689 P2d 1292, 1300 (1984) (citation omitted), *superseded on other grounds by* ORS 659A.885.

Shelton argues that without the wrongful discharge claim, he cannot recover any compensatory damages for the emotional distress that he experienced because of his termination.

In support, he cites *Patton v. Target Corp.*, No. 03-CV-1722-BR, 2007 WL 894560, at *9 (D Or Mar 21, 2007), in which the plaintiff alleged both a wrongful discharge claim and a USERRA discrimination claim.  As illustrated in *Patton*, a wrongful discharge claim provides remedies for noneconomic damages, emotional losses, and a full range of punitive damages not otherwise afforded under USERRA.  *Id* at *9-10.  USERRA only allows for recovery of lost wages and benefits (38 USC § 4323(d)(1)(B)), liquidated damages equal to the wages or benefits lost if the violation was willful (38 USC § 4323(d)(1)(C)), equitable remedies (38 USC § 4323(e)), and attorney fees and costs.  38 USC § 4323(h)(2).  Some courts have held the USERRA liquidated-damages provision constitutes a punitive remedy because it is predicated on willfulness.  *See, e.g.*, *Duarte v. Agilent Techs., Inc.*, 366 F Supp2d 1036, 1038 (D Colo 2005).

However, if Shelton's retaliation claim is successful, he will be afforded any remedy available under both USERRA and ORS 659A.885.  ORS 659A.885 governs civil actions under Chapter 659A.  As argued by Gerber and as previously held by this court, the statutory remedies in ORS 659A.885 are generally deemed adequate to protect employment-related rights for discrimination and retaliation.  *See, e.g.*, *Dearmon v. Ferguson Enters., Inc.*, No. 1:14-CV-1375-CL, 2014 WL 6063819, at *2 (D Or Nov. 12, 2014) (claim under ORS 659A.082); *Shaw v. R.U. One Corp.*, 822 F Supp2d 1094, 1098 (D Or 2011) (claim under 659A.030).

In any action under ORS 659A.885(1) alleging a violation of ORS 659A.082,[3] the court "may order injunctive relief and any other equitable relief . . . including but not limited to reinstatement or the hiring of employees," "back pay" and costs and reasonable attorney fees.  In addition:

---

[3] ORS 659A.885(1) applies to all actions alleging a violation under the sections listed in subsection (2) which includes ORS 659A.082.

> (a) The court may award, in addition to the relief authorized under subsection (1) of this section, *compensatory damages* or $200, whichever is greater, *and punitive damages;*
> (b) At the request of any party, *the action shall be tried to a jury;*
> (c) Upon appeal of any judgment finding a violation, the appellate court shall review the judgment pursuant to the standard established by ORS 19.415(1); and
> (d) Any attorney fee agreement shall be subject to approval by the court.

ORS 659A.885(3) (emphasis added).

Because Shelton alleges claims for discrimination under both USERRA and ORS 659A.082, the available remedies are adequate to protect his rights without the wrongful discharge claim. For this reason, Gerber is entitled to summary judgment against the wrongful discharge claim.

## III.    **Affirmative Defenses**

Shelton seeks summary judgment against six of Gerber's nine affirmative defenses: (1) failure to mitigate damages (Second Affirmative Defense); (2) worker's compensation bar to recovery of emotional damages (Third Affirmative Defense); (3) unclean hands (Fourth Affirmative Defense); (4) after-acquired evidence (Fifth Affirmative Defense); (5) estoppel (Sixth Affirmative Defense); (6) failure to use internal company remedies (Eighth Affirmative Defense).[4]

Because Gerber does not dispute Shelton's motion against the Third (worker's compensation), Fifth (after-acquired evidence), or Eighth Affirmative Defenses (failure to use internal company remedies), summary judgment should be granted to Shelton as to those affirmative defenses.

///

---

[4] The only remaining affirmative defenses failure to state a claim (First Affirmative Defense), unavailability of an equitable remedy (Seventh Affirmative Defense), and lack of animus (Ninth Affirmative Defense). Amended Answer (docket #22).

A.     **Failure to Mitigate (Second Affirmative Defense)**

Gerber pleads the affirmative defense that Shelton has refused and failed to mitigate his damages after his termination by pursuing a replacement job.  As a general rule, the defendant has the burden of proving a failure to mitigate damages in an employment discrimination suit. *Sias v. City Demonstration Agency*, 588 F2d 692, 696 (9th Cir 1978).  "To satisfy this burden, defendant must establish (1) that the damage suffered by plaintiff could have been avoided, *i.e.* that there were suitable positions available which plaintiff could have discovered and for which he was qualified; and (2) that plaintiff failed to use reasonable care and diligence in seeking such a position."  *Id* at 696.

Shelton has presented evidence, through his declaration and copies of internet job searches that he and his wife conducted, showing that he "diligently searched for new employment" beginning February 17, 2012.  Shelton Decl. (docket #45), ¶ 2 & Ex. A, p. 2. Gerber has presented no evidence of Shelton's failure to seek suitable positions after his termination, but instead argues that it was not required to produce documents to support this affirmative defense in response to Shelton's discovery request.  At the hearing on the motions, Gerber requested and was granted additional time to submit evidence to support Shelton's failure to mitigate damages, but filed none.  Even if Gerber's objection to Shelton's discovery request was proper, it does not discharge Gerber's burden at summary judgment.

Because Gerber has failed to meet its burden of creating a genuine dispute of material fact, summary judgment should be granted in favor of Shelton as to the Second Affirmative Defense.

///

///

**B.** **Unclean Hands & Estoppel (Fourth & Sixth Affirmative Defenses)**

Gerber also pleads the affirmative defenses of unclean hands and estoppel based on the assertion that Shelton materially misrepresented to the VETS investigator the day on which he notified Bateman about his February military leave.[5]

The VETS investigator's summary of his April 16, 2012 telephone interview with Shelton reports that Shelton "had told Mr. [Bateman] of his military duty obligation *immediately following the presentation* that he gave to Mr. Bateman on February 7, 2012. [Shelton] indicated that . . . Mr. Bateman was so upset after he told him about his military leave that he went to HR and told them that he wanted to terminate me." Oborne Decl. (docket #56), Ex. 3 (emphasis added). Gerber interprets the phrase "immediately following the presentation" to mean the same day, February 7, 2012.

In contrast, Shelton testified in his deposition that he learned about his mandatory leave in a voicemail he received after work on February 7, but did not tell Bateman until the next morning on February 8, 2012. Shelton Depo., pp. 225–27. He did not speak to anyone from Gerber after receiving the voicemail and before arriving at work the next morning. *Id*, p. 226. Shelton specifically denied telling the VETS investigator that Bateman had learned about his military leave on February 7, 2012. Tr. 227. His testimony is consistent with his earlier written statement that he signed on February 12, 2012, and submitted to the VETS investigator stating: "The evening of 7 Feb, I was informed that I needed to be present at the entire YTB. Immediately upon arriving to work on 8 Feb., I verbally communicated this obligation to Mr. Bateman." Beck Reply Decl. (docket #54), Ex. A, p. 27. Again on April 16, 2012, in a letter

---

[5] Shelton also argues that the equitable defense of unclean hands does not apply to this case which seeks only legal remedies. However, Shelton acknowledges that Oregon courts are inconsistent in recognizing unclean hands in legal actions. *See McKinley v. Weidner*, 73 Or App 396, 399–400, 698 P2d 983, 985–86 (1985) (recognizing the inconsistency). Nevertheless, because of the lack of genuine dispute on the issue, the court need not decide whether the defense applies here.

sent to the VETS investigator after the telephone interview, Shelton stated that he reported his military obligations to Bateman on February 8, 2012. *Id*, Ex. A, p. 5.

To successfully plead both estoppel and unclean hands requires Gerber to prove Shelton's bad faith or intent to misrepresent. *See Marshall v. Wilson*, 175 Or 506, 518, 154 P2d 547 (1944) (estoppel); *McKinley v. Weidner*, 73 Or App 396, 398, 698 P2d 983, 984 (1985) (unclean hands). To create Shelton's intent to misrepresent, Gerber interprets the wording used by the VETS investigator ("immediately following the presentation") to mean the same day. However, if the presentation was the last event on February 7, then Shelton's notice to Bateman of his military leave the next morning on February 8 arguably was "immediately following the presentation." Even if Shelton actually misrepresented the date during his interview with the VETS investigator, as Gerber claims, he has submitted evidence that any alleged misrepresentation was unintentional and was later corrected. For this reason, the court should grant summary judgment in favor of Shelton against the Fourth and Six Affirmative Defenses.

## RECOMMENDATIONS

Shelton's Motion for Partial Summary Judgment (docket #43) should be GRANTED as to the Second, Third, Fourth, Fifth, Sixth and Eight Affirmative Defenses.

Gerber's Motion for Summary Judgment (docket #46) should be GRANTED as to the Third Cause of Action for wrongful discharge, and otherwise DENIED.

## SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge. Objections, if any, are due Friday, February 27, 2015. If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

DATED  February 10, 2015.


s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge